CONFEDERATED TRIBES AND BANDS
OF the YAKAMA INDIAN NATION,
et al., Plaintiffs,

v.

Malcolm BALDRIGE, et al., Defendants.

Civ. No. 80–342.

United States District Court,
W.D. Washington,
at Seattle.

Sept. 7, 1995.

See also 605 F.Supp. 833.

Tim Roy Weaver, Yakima, WA, Jack Warren Fiander, Yakama Indian Nation, Office of Legal Counsel, Toppenish, WA, for Confederated Tribes.

Mason D. Morisset, Morisset, Schlosser, Ayer & Jozwiak, Seattle, WA, for Tulalip Tribe.

Sharon Ilene Haensly, Office of Tribal Attorney, Swinomish Indian Tribal Community, LaConner, WA, Allan E. Olson, LaConner, WA, for Swinomish Indian Community.

John Curtright Sledd, Evergreen Legal Services, Suquamish, WA, for Suquamish Tribe.

Phillip Evan Katzen, Allen H. Sanders, Debora G. Juarez, Evergreen Legal Services, Seattle, WA, for Stillaguamish Tribe, Squaxin Island, Skokomish Tribe, Upper Skagit Tribe, Sauk–Suiattle Tribe, Nooksack, Jamestown Klallam Indians, Lower Elwha Band of Klallams, Port Gamble Band Clallam.

Richard Mayer Berley, Marc Slonim, John B. Arum, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, WA, for Makah Tribe.

Robert L. Otsea, Jr., Laura Ann Lavi, Office of Tribal Attorney, Muckleshoot Indian Tribe, Auburn, WA, for Muckleshoot Tribe.

Phillip Evan Katzen, Allen H. Sanders, Debora G. Juarez, Evergreen Legal Services, Seattle, WA, Bill Tobin, Vashon, WA, for Nisqually Tribe.

John Howard Bell, Annette Klapstein, Debra S. O'Gara, Law Office, Puyallup Indian Tribe, Tacoma, WA, for Puyallup Tribe.

Nettie Louise Alvarez, Richard S. Ralston, Ralston & Alvarez, Seattle, WA, for Hoh Tribe.

Richard Llewellyn Davies, Leslie G. Barnhart, Quileute Natural Resources, LaPush, WA, for Quileute Tribe.

Daniel Alan Raas, Raas, Johnsen & Stuen, P.S., Bellingham, WA, for Lummi Tribe.

Howard G. Arnett, Karnopp, Petersen, Noteboom, Hubel, Hansen & Arnett, Bend, OR, for Confederated Tribes of Warm Springs Reservation.

Christopher B. Leahy, Fredericks, Pelcyger, Hester & White, L.L.C., Boulder, CO, for Conf. Tribes of Confederated Tribes of Umatilla Reservation.

Julie Sobotta Kane, Douglas R. Nash, Office of Legal Counsel, Tribal Executive Committee, Lapwai, ID, for Nez Perce Tribe of Idaho.

John E. Casperson, Faulkner, Banfield, Doogan & Holmes, Seattle, WA, for Alaska Trollers Assn.

Andrew B. Weiner, Seattle, WA, Stephen M. White, Martin K. Weinstein, Robert K. Reges, Jr., Bruce M. Botelho, Attorney General's Office, State of Alaska, Juneau, AK, Bonnie E. Harris, Attorney General's Office, State of Alaska, Anchorage, AK, Myles A. Conway, State of Alaska, Dept. of Law, Anchorage, AK, Michael A.D. Stanley, Attorney General, State of Alaska, Juneau, AK, for State of Alaska.

David D. Swartling, Mills Cogan Meyers & Swartling, Seattle, WA, Eric J. Bloch, Attorney General's Office, Salem, OR, for State of Oregon.

Robert P. Zuanich, Seattle, WA, for amicus curiae Purse Seine Vessel Owners Association.

Stephen Bruce Johnson, Garvey, Schubert & Barer, Seattle, WA, for amicus curiae Government of Canada.

Eric J. Nielsen, Richard Reich, Off. of Reservation Atty., Taholah, WA, for Quinault Indian Nation.

Katrina C. Pflaumer, U.S. Attorney's Office, Seattle, WA, Charles R. Shockey, U.S. Department of Justice, Land and Natural Resources Division, Washington, DC, Eileen Marie Cooney, National Oceanic and Atmospheric Administration, Seattle, WA, Fred R. Disheroon, William Anthony White, U.S. Department of Justice, Environmental & Natural Resources, Washington, DC, Peter C. Monson, U.S. Department of Justice, Environment & Natural Resources Division, Denver, CO, Vernon Peterson, U.S. Department of Interior, Office of Regional Solicitor, Portland, OR, for U.S.

Robert Kirk Costello, Attorney General's Office, Fish & Wildlife, Olympia, WA, for State of Washington.

## ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

ROTHSTEIN, District Judge.

THIS MATTER comes before the court on plaintiffs' request for a preliminary injunction prohibiting the State of Alaska from authorizing directed marine chinook salmon fisheries or authorizing the retention of chinook salmon in marine fisheries south of Cape Suckling for the remainder of the accounting year which ends September 30, 1995.[1] Plaintiffs also seek an order directing the parties to develop a schedule for the timely resolution of the North/South allocation determination for 1996 under Section IV B of the Stipulation and Order in *Confederated Tribes and Bands of the Yakima Indian Nation, et al. v. Malcolm Baldrige, et al.* (*"Baldrige"*), 605 F.Supp. 833 (W.D.Wash. 1985).

The court has considered the documents filed in this matter, including the briefs of the parties and of amici curiae (Canada, the Alaska Trollers Association and the Central Council of the Tlingit and Haida Indian Tribes of Alaska).[2] In addition, the court heard argument, received three days of testimony, and considered the affidavits and declarations submitted by the parties as evidence. Being fully advised, the court finds and rules as follows:

## I. BACKGROUND

The history of this case begins with the phenomenon of the Pacific salmon, a fish whose migrations cover thousands of miles from river to sea and back. In the course of its travels, the salmon pass through many different fishing grounds and do so without regard for tribal, state or national boundaries. The salmon have historically been a

1. The prohibition sought by petitioners on chinook fishing does not apply to a 2,000 chinook allowance for recreational harvest for the period August 11, 1995 through September 30, 1995, as provided by this court's August 11, 1995 Temporary Restraining Order.

2. The Alaska Trollers Association and the Central Council of the Tlingit and Haida Indian Tribes of Alaska have moved to intervene in this matter. The parties agreed to brief the motions to intervene on the following schedule: responses to the motions to intervene shall be filed by September 11, 1995; reply briefs shall be filed by September 14, 1995; and the motions to intervene shall be noted for September 15, 1995. As a result of the briefing schedule, the motions to intervene are not yet ripe. The Alaska Trollers Association and the Central Council of the Tlingit and Haida Indian Tribes of Alaska shall be treated as amicus curiae herein, as they were at the preliminary injunction hearing.

valuable resource to fisheries in each jurisdiction through which they pass.

Over the past quarter-century, it became apparent that many salmon runs of Canada and the U.S. were diminishing at an alarming rate. It also became apparent that the only manner in which to rebuild the runs was through a comprehensive approach involving all of the jurisdictions that fish for the salmon. Without such cooperation, any attempt to rebuild and preserve this vital resource was destined to fail. Thus began the negotiations that culminated in the Pacific Salmon Treaty, discussed in detail below.

In the same time frame as the Pacific Salmon Treaty negotiations, complex litigation began concerning various salmon runs. The matter currently before the court arises out of such a case filed in 1980.

*A. The Baldrige Stipulation and Order*

Throughout the 1970s and early 1980s, Canadian and United States wild chinook salmon stocks were in serious decline. In 1980, numerous northwest Indian tribes filed suit against the United States Secretary of Commerce, Malcolm Baldrige, to enforce their alleged fishing rights in Alaskan waters under the Stevens and Palmer Treaties of the mid–1850s. In 1982, the complaint was amended to join the State of Alaska. The tribes sought to compel compliance with the obligations of the treaties with respect to allocation of chinook salmon resources. In 1985, the parties entered into a stipulation and order which settled the litigation. *See Confederated Tribes and Bands of the Yakima Indian Nation, et al. v. Malcolm Baldrige, et al.*, 605 F.Supp. 833 (W.D.Wash. 1985).

The *Baldrige* Stipulation and Order stated that it was "entered into by all parties ... for the purpose of defining a procedure and standards by which the parties agree to determine the allocation of certain chinook salmon resources between fisheries in and off the state of Alaska and in fisheries in and off the states of Washington and Oregon." *Id.* at 834. The Stipulation and Order further provided that it:

intended to establish a mechanism which will permit the parties to address chinook salmon allocation issues in the cooperative

spirit necessary for effective inter-jurisdictional coordination of management and to avoid the need to litigate the legal and factual issues raised by the parties in this case concerning fisheries in and adjacent to Alaska.

*Id.*

The *Baldrige* Stipulation and Order stated that its purposes were:

A. To promote ratification and effective implementation of the U.S./Canada Pacific Salmon Treaty signed at Ottawa January 28, 1985;

B. To provide, with respect to Alaska chinook fisheries, for satisfaction of the United States' obligations, if any, to the tribes under the Stevens and Palmer Treaties;

C. To provide for a resolution of the dispute between Alaska and the other parties as to Alaska's role, if any, in the satisfaction of the United States' obligations under these treaties;

D. To provide for a fair interstate domestic allocation of chinook salmon resources originating in Washington, Oregon and Idaho and migrating to waters in and adjacent to Alaska.

Section I, *id.* at 834.

The parties to the *Baldrige* Stipulation and Order also agreed to several statements of fact, including the following:

B. There exists a dispute between Alaska and the other parties concerning whether Alaska has an obligation to limit its harvest of far north migrating salmon stocks.

C. The parties have a common interest in the wise management, enhancement, and fair division of the chinook salmon resources subject to this agreement.

D. A treaty between the United States and Canada concerning Pacific Salmon has been signed which if implemented will be mutually beneficial to all parties.

Section II, *id.* at 834–35.

The parties to the *Baldrige* Stipulation and Order also agreed to the method for determining the allocation of chinook salmon between the North (fisheries in and adjacent to

Alaska) and the South (fisheries in and adjacent to Washington and Oregon). *Id.* at 835. The parties agreed that "[t]he mechanism and standards by which the parties shall determine North/South allocation of chinook salmon stocks subject to th[e] stipulation" were, in pertinent part, as follows:

A. *Mechanism.* The parties agree that North/South allocation determinations shall be made by the U.S. Section of the Pacific Salmon Commission. Decisions of the U.S. Section of the Commission with respect to North/South allocations shall be made only by unanimous vote of the voting members thereof.

B. *Allocation During Rebuilding.* During the joint U.S.–Canada chinook rebuilding program, the North/South allocations shall be made by the Pacific Salmon Commission under the terms of the Pacific Salmon Treaty.

. . . . .

D. *Commission Decisions.* The U.S. Section of the Pacific Salmon Commission shall make good faith efforts to insure that decisions made by the Commission are consistent with the provisions of Paragraph[ ] IV B . . . above.

Section IV, *id.* at 835.

Additionally, the *Baldrige* Stipulation and Order provided that the court "retain[ed] continuing jurisdiction . . .; as to th[e] stipulation only for the purpose of enforcing th[e] stipulation, . . ." Section VI F., *id.* at 837.

### B. The Pacific Salmon Treaty

As noted above, the *Baldrige* Stipulation and Order stated that one of its purposes was "[t]o promote ratification and effective implementation of the U.S./Canada Pacific Salmon Treaty signed at Ottawa January 28, 1985." *Id.* at 834. In 1985, the United States and Canada had been negotiating the Pacific Salmon Treaty ("the PST") for over a decade. On January 28, 1985 the two countries signed the PST, 1985 WL 167273, and on March 15, 1985 the Act of Congress implementing the PST was passed. *See* Pub.L. 99–5, 99 Stat. 7, 16 U.S.C. Sec. 3631, *et seq.*

In Annex IV, Chapter 3, the PST stated the following:

1. Considering the escapements [3] of many naturally spawning chinook stocks originating from the Columbia River northward to southeastern Alaska have declined in recent years and are now substantially below goals set to achieve maximum sustainable yields, and recognizing the desirability of stabilizing trends in escapements and rebuilding stocks of naturally spawning chinook salmon, the Parties shall

(a) instruct their respective management agencies to establish a chinook salmon management program designed to meet the following objectives:

(i) halt the decline in spawning escapements in depressed chinook salmon stocks;

(ii) attain by 1998 escapement goals established in order to restore production of naturally spawning chinook stocks, as represented by indicator stocks identified by the Parties, based on a rebuilding program begun in 1984.

(b) jointly initiate and develop a coordinated chinook management program.

(c) establish a Joint Chinook Technical Committee (Committee) reporting . . . to the Northern and Southern Panels and to the Commission, . . .

. . . . .

(f) manage all salmon fisheries in Alaska, British Columbia, Washington and Oregon, so that the bulk of depressed stocks preserved by the conservation program set out herein principally accrue to spawning escapement.

(g) . . . It is recognized that the Parties are to share the benefits of coastwide rebuilding and enhancement, consistent with such internal allocation determinations and this Treaty.

Annex IV, Chapter 3, the PST.

### C. The Pacific Salmon Commission and the Chinook Technical Committee

In the years since the *Baldrige* Stipulation and Order was entered and the PST was

---

3. "Spawning escapement," as used by the PST and the parties, as well as in the court's order, refers to the chinook salmon that escape harvest by the various fisheries, and proceed on to their spawning areas.

signed, the Pacific Salmon Commission and the Chinook Technical Committee have been formed as mandated by the PST. *See* Article II & Annex IV, Ch. 3 of the PST. These entities are described briefly below.

#### 1. The Pacific Salmon Commission

The Pacific Salmon Commission ("the PSC") is a bilateral commission made up of a Canadian Section and a United States Section. The Commission consists of a maximum of eight Commissioners, with a maximum of four in each Section. The U.S. Section (made up of Alaska, Oregon and Washington together, the Treaty Tribes, and the United States) and the Canadian Section appoint the members of their respective sections, as well as four alternate Commissioners to serve in the absence of any Commissioner in the alternate's section. Within the U.S. Section, there are three voting members, one each representing Alaska, Washington and Oregon together, the Treaty Tribes, plus a non-voting representative of the United States. Additionally, each Section has one vote in the bilateral U.S.–Canada Commission. A decision or recommendation of the Commission is made only with the approval of both sections. Article II, PST. The Commission has also established a Northern and a Southern Panel, pursuant to Annex I of the PST. The Panels, which consist of a maximum of six members from the U.S. and six from Canada, provide information and make recommendations to the Commission. *Id.*

As noted above, Section IV A of the *Baldrige* Stipulation and Order, stated that "North/South allocation determinations shall be made by the U.S. Section of the Pacific Salmon Commission" and that "[d]ecisions of the U.S. Section of the Commission with respect to North/South allocations shall be made only by unanimous vote of the voting members thereof." *Baldrige*, 605 F.Supp. at 835. Additionally, Section IV B of the Stipulation and Order provided that "[d]uring the joint U.S.–Canada chinook rebuilding program, the North/South allocations shall be made by the Pacific Salmon Commission under the terms of the Pacific Salmon Treaty." *Id.* The parties agree that there must be unanimity among the U.S. Section members on an allocation agreement prior to present-ing it to the Canadian Section for consideration. *See e.g.,* testimony of G.I. James, 8/30/95 Hearing.

#### 2. The Chinook Technical Committee

The Chinook Technical Committee ("the CTC") was created pursuant to Annex IV, Chapter 3 of the PST. The CTC reports to the Northern and Southern Panels. Pursuant to the terms of the PST, the CTC was intended to:

(i) evaluate management actions for their consistency with measures set out in this Chapter and for their potential effectiveness in attaining these specified objectives;

(ii) evaluate annually the status of chinook stocks in relation to objectives set out in this Chapter and, consistent with paragraph (d)(iv) beginning in 1986, make recommendations for adjustments to the management measures set out in this Chapter;

(iii) develop procedures to evaluate progress in the rebuilding of naturally spawning chinook stocks;

(iv) recommend strategies for the effective utilization of enhanced stocks;

(v) recommend research required to implement this rebuilding program effectively;

(vi) exchange information necessary to analyze the effectiveness of alternative fishery regulatory measures to satisfy conservation objectives.

Annex IV, Chapter 3, the PST.

Beginning in the 1980s, the CTC developed a scientific model for estimating the abundance of chinook salmon. In this context, abundance refers to the total number of fish available. The CTC model is constantly being updated with more recent information concerning the chinook salmon. It has been updated to take advantage of technological (computer) advances and to take into account improved methods of estimating the numbers of fish. (e.g., the increased tagging with Coded Wire Tags ("CWT") of hatchery-reared chinook salmon). The model, which undergoes continuous peer review, is the primary tool the CTC relies upon to evaluate the impact of fishery management regimes on the chinook salmon rebuilding program.

The CTC model is a proportional model which uses an "Exploitation Rate Index" ("ERI") to determine the allowable catch of chinook salmon for that counting year.

### D. The Temporary Restraining Order

On August 4, 1995 numerous tribes,[4] as well as the States of Washington and Oregon, moved to enforce the *Baldrige* Stipulation and Order by bringing a Motion for a Temporary Restraining Order in this court. These parties are referred to collectively herein as "plaintiffs." Plaintiffs sought an order temporarily enjoining Alaska from opening its proposed third chinook salmon fishery. The plaintiffs also sought an order requiring Alaska to provide the data necessary to review Alaska's proposed 1995 chinook salmon fisheries management plan. On August 11, 1995, this court granted plaintiffs' requested Temporary Restraining Order. Since this court's order, Alaska has refrained from opening a third chinook salmon fishery this season and has promptly turned over the requested information to the CTC.

### II. PRELIMINARY INJUNCTION STANDARD

According to the Ninth Circuit Court of Appeals:

The traditional equitable criteria for granting preliminary injunctive relief are (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if the preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest . . .

*Los Angeles Memorial Coliseum Com'n v. Nat. Football,* 634 F.2d 1197, 1200 (9th Cir. 1980) (citations omitted); *see also State of Alaska v. Native Village of Venetie,* 856 F.2d 1384, 1388 (9th Cir.1988).

■ As this standard has developed in the Ninth Circuit, "plaintiffs are entitled to preliminary injunctive relief" if they demonstrate "probable success on the merits," and a "possibility of irreparable injury," or if they demonstrate "a fair chance of success on the merits (i.e., serious questions are raised),"

and "the balance of hardships tips sharply in their favor." *Native Village of Venetie,* 856 F.2d at 1389.

As the parties have come before the court on a preliminary injunction, and not for a final determination of the merits, the court's findings set forth in this opinion are subject to revision upon presentation of further evidence should the parties request a trial on the merits.

### III. DISCUSSION

#### A. The Parties' Contentions

Plaintiffs have brought this action to enforce the *Baldrige* Stipulation and Order. Alaska argues that the court does not have jurisdiction to determine this dispute and that even if the court did have jurisdiction, Alaska's 1995 Plan does not violate the *Baldrige* Stipulation and Order. Plaintiffs allege that the actions of the State of Alaska with respect to its proposed August to September 1995 fishing regime violate the terms and intent of the Stipulation and Order and, therefore, plaintiffs seek to enjoin the implementation of Alaska's 1995 Plan. Based on the evidence presented at the preliminary injunction hearing, plaintiffs have convinced the court that they are likely to prevail on the merits.

#### B. Jurisdiction

■ As a threshold issue, the court must address Alaska's jurisdictional argument. Alaska contends that this court does have authority to force Alaska to reach a consensus with the other PSC members on the issue of allocation of chinook salmon. Alaska's argument misses the mark. The requirement of unanimity in PSC decisions is not the court's concern. It is not this court's function to resolve possible problems with the Pacific Salmon Treaty process. Nor is it this court's function to determine what or who is causing these problems. Rather, the court has before it the issue of whether or not Alaska is in violation of the *Baldrige* Stipulation and Order entered by the court in 1985.

---

**4.** The tribes which are before the court on this matter are as follows: Confederated Tribes and Bands of the Yakama Indian Nation, Tulalip Tribes, Quinalt Nation, Warm Springs Tribe, Stil-

laguamish Tribe, Lummi Tribe, Quileute Tribe, Hoh Tribe, Umatilla Tribe, and Nez Perce Tribe. Canada has entered the case as amicus curiae.

The language of the Stipulation and Order itself indicates that the parties intended to obligate themselves to work in furtherance of the purposes they set out in the Stipulation and Order, namely "[t]o promote ratification and effective implementation of the U.S./Canada Pacific Salmon Treaty signed at Ottawa January 28, 1985," and "[t]o provide for a fair interstate domestic allocation of chinook salmon resources originating in Washington, Oregon and Idaho and migrating to waters in and adjacent to Alaska." *Baldrige*, Section I, 605 F.Supp. at 834.

■ Furthermore, a settlement agreement is a contract. *Mahboob v. Dept. of the Navy*, 928 F.2d 1126, 1128 (Fed.Cir.1991). A district court has the equitable power to enforce an agreement to settle a case pending before it. *Callie v. Near*, 829 F.2d 888, 890 (9th Cir.1987). In this case, the court explicitly retained jurisdiction to enforce the stipulation. *Baldrige*, 605 F.Supp. at 837; *see Kokkonen v. Guardian Life Ins. Co. of America*, —— U.S. ——, 114 S.Ct. 1673, 1677, 128 L.Ed.2d 391 (1994).

■ All contracts impose upon each party "a duty of good faith and fair dealing in its performance and its enforcement." § 205, Restatement (Second) of Contracts (Comment a. "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party").

The court concludes that it has jurisdiction to examine whether Alaska has fulfilled its duty to act in good faith in performing its obligations under the *Baldrige* Stipulation and Order.

### C. Scientific Merit of the 1995 Plan

Alaska argues that even if the court has jurisdiction over this matter, its 1995 Plan is valid and it should be permitted to implement it. The court does not intend to determine which is the correct scientific model for estimating the abundance of, or the appropriate catch levels of, the various chinook salmon stocks. Rather, at issue is the good faith of Alaska in fulfilling its obligations under

the Stipulation and Order, a duty which is independent of the Pacific Salmon Treaty.

### D. The CTC Model and 1995 Alaska Plan

#### 1. The CTC Model & the Catch–Ceiling Approach

Beginning in the 1980s, the CTC developed a scientific model that has been used since that time by the CTC to estimate the abundance of chinook salmon.[5] The model is the primary tool the CTC relies upon to evaluate the impact of fishery management regimes on the chinook salmon rebuilding program of the PST. The CTC model is a proportional model which uses an "Exploitation Rate Index" ("ERI") to determine the allowable catch of chinook salmon for that accounting year. The CTC model is constantly being updated with recent information concerning the chinook salmon. It has been updated to take advantage of technological (computer) advances and to take into account improved methods of estimating the numbers of fish, e.g., the increased tagging with Coded Wire Tags ("CWT") of hatchery-reared chinook salmon.

Under the PST, the U.S. and Canada agreed to implement the chinook salmon rebuilding program based upon a catch ceiling approach. Under this approach, catch ceilings (an absolute number of fish to be caught) would be maintained on greater abundance as chinook salmon stocks were rebuilt. Thus, the stock exploitation rates, the percentage of available fish caught, would decline as the stocks were rebuilt. The parties rejected a harvest rate alternative which would have permitted catches to increase as stocks increased. Implementing a harvest rate alternative would have required much more severe cuts in the number of fish permitted to be caught at the beginning of the rebuilding period. Under the CTC model, the allowable catch for Alaska would be 140,-000 chinook salmon for the 1995 accounting year. Alaska has already exceeded this, having already caught approximately 175,000 chinook salmon.

#### 2. The 1995 Alaska Plan

In March 1995, Alaska announced that it intended to implement an abundance-based

---

**5.** In this context, abundance refers to the total number of chinook salmon available.

management regime for its Southeast Alaskan chinook salmon fisheries, as opposed to the catch ceiling method employed in the past. Alaska intended to use this plan for the 1995 accounting period, which runs from October 1, 1994 to September 30, 1995. Thus, the 1995 Plan was proposed mid-way through the 1995 accounting period.

The 1995 Plan was based upon a new model proposed by Alaska, one which did not rely exclusively on the CTC model. Alaska's proposal, ("the 1995 Plan"), relied upon an in-season abundance index, as opposed to the pre-season estimates used by the CTC model, and used a harvest rate based upon an average of the harvest rates for 1991 through 1993. Alaska's abundance indicator relied upon a 400 Boat Index using the catch statistics of Alaska's 400 top-producing fishing trollers to estimate in-season abundance rather than the predicted abundance figure produced by the CTC's pre-season model. Alaska developed this in-season abundance-based model because it believes that the CTC's model underestimates actual abundance, and therefore results in lower-than-necessary catch ceilings. Under Alaska's proposed 1995 Plan, its allowable catch would be 230,000 chinook salmon, rather than the 140,000 allowable catch under the CTC model.

In March 1995, the 1995 Plan was submitted to the U.S. Section of the PSC by the U.S. Section of the Northern Panel. To date, the U.S. Section has not reached unanimity with respect to the 1995 Plan and therefore has not officially presented the Plan to the Canadian Section of the Pacific Salmon Commission for consideration.[6] However, it is undisputed that Canada opposes implementation of the 1995 Plan.

E. *The Court's Findings Concerning the 1995 Alaska Plan*

1. *Time Constraints Did Not Permit Proper Review of the 1995 Plan*

None of the scientists who testified concerning the 1995 Plan were able to support the adequacy of the timing and scientific review the 1995 Plan had undergone. Rather, each of the two bodies outside of ADF & G which performed reviews of the 1995 Plan concluded that more time for review was necessary before implementation. In addition, the Alaska scientist responsible for developing the model used in the 1995 Plan admitted that he had not yet had sufficient time in which to review the suggestions and criticisms of the review by the CTC and had not yet incorporated them, as well as other suggested changes, into his model.

a. *National Marine Fisheries Service Review of the 1995 Plan*

In April 1995, the Alaska Department of Fish and Game (referred to herein as either "the ADF & G" or "the ADFG") submitted the 1995 Plan to the National Marine Fisheries Service ("NMFS") as part of the biological assessment undertaken by NMFS of the Southeast Alaska chinook salmon fisheries. The NMFS Panel reviewed the 1995 Plan on June 19–20, 1995 and issued its report on July 14, 1995. The NMFS Panel consisted of three scientists from the Northwest Region office and four scientists from the Alaska Center.

In its report, the NMFS Panel concluded that further work was needed "to determine which index [the CTC exploitation rate index or the ADFG harvest rate index] provides the most accurate estimate of relative change in harvest rate, ..." p. 2, NMFS Panel Chinook Review. The Panel also noted that "[i]mplementation of abundance-based management depends fundamentally on the ability to estimate abundance ... with reasonable accuracy" and that "[m]ethods used to estimate preseason, in season and postseason abundance should also be carefully reviewed to ensure that each provides a measure of true abundance." *Id.*

The NMFS Panel considered the May 31, 1995 report of the U.S. Ad Hoc Technical Working Group ("AHTWG") of the CTC. The Panel noted that the AHTWG "found

---

6. The evidence presented at the preliminary injunction hearing indicated that the Oregon/Washington and Tribal representatives opposed the 1995 Plan, while the Alaska representative supported it. However, without unanimity, the U.S. Section was unable to present any position on the matter to Canada.

sufficient merit in [the proposed harvest rate index] to warrant proceeding with an analysis" of the 1995 Plan, but that the AHTWG "did not have sufficient time to compare" the harvest rate index ("the HRI") of the Plan with the "Exploitation Rate Index" ("the ERI") used in the CTC model. *Id.* at 3. The NMFS Panel stated that it "concur[red] with the need for an intensive analysis of the technical merit of the two procedures by the CTC." *Id.*

The NMFS Panel identified several "concerns that do not support preference of the HRI to the ERI," *id.* at 6, one of which was that the HRI target troll catch function was more curvilinear than that with the ERI, and therefore the "target troll catch was much greater for HRI, with Alaska hatchery tags included, than for ERI over the range of the abundance index considered, ..." *Id.*

The NMFS Panel also emphasized the need for rigorous CTC review of the methodology for estimating the harvest rate. When the Panel participants were polled individually as to their preferred alternative for setting the 1995 target harvest, *"[n]o one recommended use of the ADFG proposed approach in 1995, prior to the needed review by the CTC."* *Id.* at 7–8 (emphasis added).

### b. CTC Review of the 1995 Plan

Subsequent to a hearing in this court on August 11, 1995, the CTC reviewed Alaska's 1995 Plan. Prior to the hearing, some of the data related to the 1995 Plan had not been submitted to the CTC.[7] Subsequent to this court's Temporary Restraining Order, Alaska gave the CTC members all of the requested information.

The results of the CTC review are contained in a report dated August 24, 1995. The CTC report contained an "Executive Summary" which outlined various aspects of the 1995 Plan and listed the CTC's conclusions with respect to the Plan. The CTC

noted that the key elements of the ADF & G proposal were as follows:

> * A new method for estimating fishery harvest rate indices (HRI) for the SEAK [Southeast Alaska] troll fishery.

> * A 1995 target harvest rate for reported catch equal to the 1991–1993 average fishery index for the SEAK troll fishery.

> * An inseason index of abundance ("400 BI") based on catch data for the top-producing 400 trollers during the first 5 days of the summer troll season in July.

p. vii, CTC Report.

The CTC report summarized its review of two aspects of ADF & G's 1995 Plan: "(a) the methods and data underlying the [1995 Plan]; and (b) the consistency of [using] the 1991–1993 target harvest rate with the objective of rebuilding depressed chinook stocks by 1998." *Id.*

In its report, the CTC noted various methodological problems it encountered with the 400 Boat Index ("the 400 BI") employed in the 1995 Plan, stating that "the CTC is concerned with the effect of simplification in the methodology that fails to account for variation in landing date versus catch date, variation in length and timing of seasons, and fishery/stock behavior on the 400 BI" and noting that the "proposed relationship between the 400 BI and the CTC's abundance index is not proportional." *Id.* at vii–viii.

Additionally, the CTC noted with concern, as had the NMFS Panel, the curvilinear relationship between the CTC abundance index and the allowable catch when the Plan's proposed procedures and data are used for estimating the Harvest Rate Index ("HRI"). This curvilinear relationship "allows a higher level of catch at a low abundance index and a lower level of catch at a high abundance index, compared to a proportional relationship." *Id.* at viii.

---

7. Plaintiffs presented witnesses who testified that they had requested information from ADF & G concerning its 1995 Plan and that this information was not forthcoming. For example, Dr. Morishima, a member of the CTC, repeatedly requested additional information from ADF & G scientists and staff and was given no information or incomplete information in response. At the preliminary injunction hearing it became evident that Alaska, fearing litigation, had altered its procedures for releasing information to the CTC concerning chinook, thereby slowing down or impeding the flow of information to CTC members concerning the 1995 Plan. *See* 7/31/95 Marshall Letter, Ex. H, 8/4/95 Morishima Decl.

The CTC concluded that the curvilinear form of the relationship "indicate[d] that either the underlying theory is faulty or the data used to estimate the parameters of the CTC abundance index and allowable catch are inconsistent with true values for abundance or true harvest rate, or both." *Id.*

The CTC members agreed that the "1991–1993 average harvest rate for reported catch for the SEAK troll fishery is not a substantial reduction from recent years." *Id.* The CTC also noted that in its 1994 report, it had recommended "that substantial reductions in total fishing mortality should be implemented beginning in 1995." *Id.* The CTC concluded that the "1991–1993 average HRI produces a total mortality rate that exceeds the original 1984 CTC model expectations for 1995 by 36%." *Id.*

The CTC members unanimously recommended the following:

1. *The ADF & G approach, as originally proposed, should not be implemented in 1995.*

2. If an abundance-based approach is implemented, proportional models should be used until inconsistencies between empirical and theoretically-based models are resolved. The CTC has not identified a specific proportional model that the CTC recommends at this time.

.  .  .  .  .

6. A management approach based on aggregate abundance should consider conservation concerns for impacted stocks and reallocation of healthy stocks. If conservation impacts are ignored, either of two results can be expected: (a) other jurisdictions will be forced to compensate by reducing their fisheries; or (b) spawning escapements will decrease, negatively impacting the rate of rebuilding of these stocks.

*Id.* at ix (emphasis added).

Dr. Gary Morishima, who testified as an expert concerning the management of ocean fisheries, is a member of the CTC. He was one of the CTC scientists who reviewed the 1995 Alaska Plan. Dr. Morishima testified that, in his opinion, the 1995 plan is based upon a sound theoretical principle but that factors relating to its implementation are problematic. He testified that further re-view of modifications recommended to the 1995 Plan would be advisable and that corrections for errors, or refinement of the variables used in the 1995 Plan's model, would be required for the 1995 Plan to be evaluated properly and deemed consistent with the rebuilding obligation under the PST. p. 177, 8/31/95 Transcript.

Dr. Morishima testified that it was his opinion that use of the 1991 to 1993 average target harvest rate, as in the 1995 Plan, is not consistent with the rebuilding program of the PST. *Id.* at 165.

### c. A D F & G Has Not Yet Had Time to Incorporate Changes

Dr. John E. Clark, a biometrician with ADF & G for 13 years, testified as a fisheries expert on behalf of Alaska. Dr. Clark oversaw the development of the abundance-based model underlying the 1995 Plan. He testified that there was no "*one* estimate [of the target catch, he] could provide" if the fishing season opened now, but that he "could provide a range" of a total treaty catch by Alaska of 190,000 to 230,000 chinook salmon. He agreed that the 40,000 difference between the upper and lower ends of his range was substantial.

Dr. Clark acknowledged that the CTC, in the course of reviewing the 1995 Plan, found some problems with the data used in the model for the 1995 Plan. He also testified that he was aware of criticism and changes suggested by the CTC but that he had not yet had time to completely review them or to incorporate them into the 1995 Plan. Dr. Clark testified that he recognized the importance of peer review in the scientific process and believed that the CTC review of the 1995 Plan and of the final model would be important and helpful.

Dr. Clark testified that he recognized that the NMFS Panel review had been limited because of insufficient time. *Id.* at 17–18. Dr. Clark also testified that he believed Alaska's intention was to introduce the 1995 plan in the 1995 season and to incorporate criticisms, suggestions and concerns into the model for 1996.

It was apparent from Dr. Clark's testimony that there has not been sufficient time for adequate CTC review, and that even with respect to the hurried review that was done, there has been no opportunity to incorporate its results into the model for the 1995 Plan. In addition, at the time of the preliminary injunction hearing, Dr. Clark had only recently received some new, corrected data and had not yet had time to incorporate it into the model for the 1995 Plan. Dr. Clark quite candidly testified that there is "no one model" underlying Alaska's plan to harvest additional chinook salmon, but rather a combination of outcomes determined by the various ranges which are derived from various models.

### 2. Alaska's Duty of Good Faith

■ The *Baldrige* Stipulation and Order provided that it:

intended to establish a mechanism which will permit the parties to address chinook salmon allocation issues in the cooperative spirit necessary for effective interjurisdictional coordination of management and to avoid the need to litigate the legal and factual issues raised by the parties in this case concerning fisheries in and adjacent to Alaska.

*Baldrige*, 605 F.Supp. at 834.

Additionally, the *Baldrige* Stipulation and Order stated that its purposes were:

A. To promote ratification and effective implementation of the U.S./Canada Pacific Salmon Treaty signed at Ottawa January 28, 1985;

. . . . .

D. To provide for a fair interstate domestic allocation of chinook salmon resources originating in Washington, Oregon and Idaho and migrating to waters in and adjacent to Alaska.

Section I, *id.* at 834.

Based on the facts presented at the hearing, a strong showing has been made that Alaska's actions in attempting to impose its 1995 Plan violate the explicit intent of the *Baldrige* Stipulation and Order to promote the "effective implementation" of the PST and to provide a "fair interstate domestic allocation of chinook salmon resources."

The fact that Alaska proposed an alternative method of determining salmon allocation is not in itself violative of any term of the *Baldrige* Stipulation and Order. In fact, as a result of Alaska's concerns with the CTC model, the court finds it reasonable that Alaska wanted to explore alternative models or a refinement of the CTC model. However, the court finds that, based on the evidence presented, Alaska acted unreasonably in the manner in which it attempted to implement its 1995 Plan. The only scientific reviews outside of the ADF & G, the NMFS Panel review and the CTC review, found that the 1995 Plan should *not* be implemented as proposed and that further scientific review and modification was necessary.[8] Plaintiffs have made a strong showing that by ignoring the recommendations of the scientific panels that the 1995 Plan not be implemented as proposed, and attempting to proceed even though its own scientists had not had time to incorporate suggestions which have been acknowledged as valid, Alaska has not fulfilled its obligations under the Stipulation and Order in good faith and that by acting unreasonably in pursuing its interests within the PST procedures, Alaska has acted in derogation of the duty it assumed in the *Baldrige* Stipulation and Order.

It evidences a lack of good faith to attempt to implement the 1995 Plan without giving the PST processes, in particular the CTC review process, the opportunity to work. The court will not attempt to second-guess the numerous fisheries scientists concerning which method of estimating abundance should be used or which years' data should be used in calculating harvest rates. The scientific review process, if given the opportunity to function properly, appears adequate to determine the proper methods and variables needed to estimate abundance and catch ceilings. Unfortunately, the 1995 Alaska Plan was not presented in a manner which allowed time for proper review.

■ It is clear that through the unanimity requirement, the *Baldrige* Stipulation and Order granted each of the voting participants veto power. However, the parties to that Stipulation and Order must act under an

8. The court notes that the NMFS and the CTC    review panels included Alaska scientists.

inherent limit on that veto power, i.e., their duty to perform in good faith.

## IV. APPLICATION OF PRELIMINARY INJUNCTION STANDARD

### A. Success on the Merits

The court finds, based on the above, plaintiffs have shown a strong likelihood of success on the merits on the issue of whether Alaska has failed to perform in good faith under the *Baldrige* Stipulation and Order. On the evidence before the court, Alaska has not acted in a manner which "promote[s] ... effective implementation of the U.S./Canada Pacific Salmon Treaty signed at Ottawa January 28, 1985" or which is likely to "provide for a fair interstate domestic allocation of chinook salmon resources originating in Washington, Oregon and Idaho and migrating to waters in and adjacent to Alaska." Sections I A & I D, *Baldrige*, 605 F.Supp. at 834.

### B. Irreparable Harm

■ The court finds that plaintiffs have demonstrated the "possibility of irreparable injury ... if preliminary relief is not granted." Plaintiffs have shown that they may be directly and indirectly irreparably harmed by Alaska's implementation of its 1995 Plan. The direct harm to the plaintiffs results from the possibility of an excessive harvest under the 1995 Plan of Washington and Oregon far north migrating stocks of chinook salmon stocks resulting from Plan deficiencies in estimating in-season abundance, or other deficiencies. In the context of the court's finding on Alaska's failure to fulfill its obligations under the *Baldrige* Stipulation and Order, plaintiffs are at risk of losing the benefit of the bargain they gained in the settlement of *Baldrige*. The indirect harm to plaintiffs results from the effect of Alaska's possible excessive harvest of chinook salmon on the available fish in Canadian waters.

#### 1. Direct Effect on Washington and Oregon Chinook Salmon Stocks

Throughout the preliminary injunction hearing Alaska relied on a chart referred to as Alaska's Exhibit Seven. By stipulation, it was introduced as evidence during the hearing. The exhibit is a table, prepared by the CTC, of "[r]esponses of wild model stocks to alterative harvest scenarios." The parties agree that five of the stocks listed on the chart are far north migrating chinook salmon stocks from Oregon and Washington. These are the Stillaguamish Wild, the Snohomish Wild, the Columbia Upriver Brights, the Lewis River Wild and the Columbia River Summer. Of the five, two are considered to have already reached their rebuilding goals under the PST: the Columbia Upriver Brights and the Lewis River Wild. Of the others, the chart indicates that even if Alaska's fisheries took a 50 percent reduction from the average 1991–1993 total mortality rates using the CTC model, the rebuilding status of those three stocks would improve by only small percentages. However, even those small percentages represents a significant portion of the rebuilding achievement for certain stocks. For example, under the CTC model, the Columbia Upriver Summer stock is anticipated to be rebuilt at only 41 percent in 1998. If Alaska's total mortality rate was reduced to 50 percent of the average 1991–1993 rate, the Columbia Upriver Summer stock is anticipated to rebuild by four percent.

As Thomas D. Cooney of the Washington Department of Fish and Wildlife testified, a four percent improvement amounts to nearly 10 percent of the rebuilding gains for that stock. Dr. Morishima testified that if the mortality of a particular stock is reduced by one or two percent, a measurable benefit to the stock is achieved, although that reduction alone may not constitute a substantial reduction. pp. 181–185, 8/31/95 Hearing Transcript.

The court finds that the estimated impact of Alaska's proposed 1995 Plan, even using the evidence upon which Alaska relied at the preliminary injunction hearing, poses the threat of irreparable harm to these depleted stocks and therefore to plaintiffs. This is particularly true where there is such scientific uncertainty as to the impact the Alaska method might have. It may vastly overstate in-season abundance, thus inflating the target catch, and thereby negatively impact the Washington and Oregon stocks.

The possibility of direct, irreparable harm to the Washington and Oregon stocks is also

seen in Alaska's Exhibit Nine. Exhibit Nine is a chart prepared by the CTC which illustrates the terminal runs of four indicator chinook salmon stocks under different Alaskan fisheries management regimes. The terminal runs consist of those fish who have passed through (i.e., not been caught in) other fisheries on their way to spawning grounds, although they may still be subject to harvest by terminal fisheries. Under the various scenarios shown on the Exhibit, it is clear that the proposed 1995 Plan could negatively impact the terminal run of the only Washington/Oregon stock listed on the chart, the Columbia River Summers. When compared with the results of using the CTC model, the court finds that the 1995 Plan could significantly reduce the terminal run of the Columbia River Summers, a stock which is estimated to be only 41 percent rebuilt by 1998.

### 2. Indirect Effect on Washington/Oregon Stocks

During the preliminary injunction hearing, evidence was presented on the so-called "domino effect" that Alaska's fisheries management regimes have upon Canadian regimes, and the subsequent impact of the Canadian regimes on the Washington and Oregon fisheries. To summarize, the testimony indicated that if Alaska fisheries catch an excessive number of fish relative to the actual abundance in a given year, fewer of those fish will migrate south from Alaska through Canadian waters. Thus, Canada's catch, even if it remains constant with the previous year, depletes a greater percentage of the available pool of fish and cuts into the share of chinook salmon which would otherwise have been left for to Washington and Oregon fisheries. Thus, a showing has been made that Alaska's fishing regimes impact Canadian regimes, which in turn affect those in Washington and Oregon.

The *Baldrige* Stipulation and Order provided that it was:

> intended to establish a mechanism which will permit the parties to address chinook salmon allocation issues in the cooperative spirit necessary for effective inter-jurisdictional coordination of management and to avoid the need to litigate the legal and factual issues raised by the parties in this

case concerning fisheries in and adjacent to Alaska.

*Id.* at 834.

The *Baldrige* Stipulation and Order also stated that one of its purposes was "[t]o promote ratification and effective implementation of the U.S./Canada Pacific Salmon Treaty signed at Ottawa January 28, 1985." Section I, *id.* at 834. The parties to the *Baldrige* Stipulation and Order also agreed to several statements of fact relevant to the stipulation. These statements of fact included the following: "A treaty between the United States and Canada concerning Pacific Salmon has been signed which if implemented will be mutually beneficial to all parties." Section II D, *id.* at 834–35.

The *Baldrige* Stipulation and Order clearly was intended to promote the implementation of the PST and acknowledged the need for a "cooperative spirit necessary for effective interjurisdictional coordination of management" of the chinook salmon resource. It is acknowledged by the parties that the salmon runs are inter-related coastwide. There was persuasive testimony at the hearing that if Alaska increases the number of chinook salmon it catches, there will be fewer available chinook salmon in the pool from which the Canadian fisheries draw. Therefore, the Canadians would take fish which might have otherwise been available to the fisheries in Washington and Oregon. If each jurisdiction is taking additional fish from a pool depleted by Alaska's excessive estimate of the catch available to it, then fewer chinook salmon will survive to spawn and the PST goal of increasing the spawning escapement will be thwarted.

The court finds that this indirect harm to Washington and Oregon stocks also supports a finding that plaintiffs have shown the possibility of irreparable harm for purposes of this preliminary injunction.

### 3. A Balance of Hardships & the Public Interest

■ Although the court recognizes that harm will be suffered by Alaskans who will not be permitted to conduct a third chinook salmon fishery during the remainder of the 1995 accounting period, the court finds that

 

the balance of hardships favors plaintiffs' position. If the chinook salmon stocks are depleted in derogation of the parties' stated intentions in the *Baldrige* Stipulation and Order, there will be fewer and fewer chinook salmon available to be harvested by any of the interested parties. Additionally, if Alaska catches an excessive number of chinook salmon, those available to Washington and Oregon may be reduced, either immediately because fewer chinook salmon will be left to migrate south from Alaskan waters, or in the future because the runs are not rebuilding. The Stipulation and Order was intended to provide "for a fair interstate domestic allocation of chinook salmon resources originating in Washington, Oregon and Idaho and migrating to waters in and adjacent to Alaska." Section I, *Baldrige*, 605 F.Supp. at 834. If Alaska is not participating in the designated procedures with good faith, the intent of the Stipulation is contravened. The harm to the chinook salmon stocks, and the resulting harm to each of the jurisdictions, causes the balance of hardship to tip in plaintiffs' favor.

Additionally, the court finds that the public interest is advanced by the injunction. Sufficient time for a scientific review of the Alaska Plan, and full participation by Alaska in the Pacific Salmon Treaty process, will serve the public interest by furthering the intent of the *Baldrige* Stipulation and Order and its agreement to promote effective implementation of the PST.

### V. CONCLUSION

The court finds that plaintiffs have made a strong showing on their claim that Alaska has not acted in good faith in fulfilling its obligations under the *Baldrige* Stipulation and Order. Therefore, plaintiffs are likely to prevail on the merits. Accordingly, the court GRANTS plaintiffs' motion for a preliminary injunction as follows:

The State of Alaska shall be prohibited from authorizing directed marine chinook salmon fisheries or authorizing the retention of chinook salmon in marine fisheries south of Cape Suckling for the remainder of the accounting year which ends September 30, 1995. This prohibition does not apply to a 2,000 chinook salmon allowance for recreational harvest for the period August 11, 1995 through September 30, 1995.

Before the court will consider the request of plaintiffs for an order directing the parties to develop a schedule for the timely resolution of the North/South allocation determination for 1996, the court needs further input from the parties. The court takes this aspect of the Motion for Preliminary Injunction under advisement.

Finding that there is no just reason for delay, the court directs entry of judgment.